**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Quentin T. WILES, Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Patrick J. SCHLEIBAUM,**
**Defendant–Appellant.**

Nos. 94–1592, 95–1022.

United States Court of Appeals,
Tenth Circuit.

Dec. 10, 1996.

broad to put an employer on notice of the potential for a complaint alleging class-based discrimination.

Vincent J. Oliva, Assistant United States Attorney (Henry L. Solano, United States Attorney and John M. Hutchins, Assistant United States Attorney, with him on the briefs), Denver, CO, for Plaintiff–Appellee.

Daniel J. Sears of Daniel J. Sears, P.C., Denver, CO (panel argument), and Michael R. Doyen of Munger, Tolles & Olson, Los Angeles, CA (en banc argument), (Daniel T. Smith, Denver, CO; Cary B. Lerman of Munger, Tolles & Olson, Los Angeles, CA; and H. Alan Dill and Robert A. Dill of Dill, Dill, Carr & Stonbraker, Denver, CO, with them on the briefs), for Defendant–Appellant Quentin T. Wiles.

Thomas D. Birge of Brega & Winters, P.C., Denver, CO, for Defendant–Appellant Patrick J. Schleibaum.

Before SEYMOUR, Chief Judge, and PORFILIO, ANDERSON, TACHA, BALDOCK, BRORBY, EBEL, KELLY, HENRY, BRISCOE, LUCERO, and MURPHY, Circuit Judges, as to Part II.A.*

Before BALDOCK, SETH, and BRORBY, Circuit Judges, as to Parts I. & II.B–F.**

BALDOCK, Circuit Judge.

Miniscribe was a Colorado-based manufacturer of computer hard disk drives. These criminal appeals arise from its management's fraudulent cover-up of a multimillion dollar inventory overstatement between December 1986 and January 1989, which falsely inflated Miniscribe's profits and accelerated its descent into bankruptcy.

Defendant Patrick J. Schleibaum is the former chief financial officer and vice president of Miniscribe. Schleibaum was charged in a two-count criminal indictment with making false statements to the government in violation of 18 U.S.C. § 1001, and securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a) and 17 C.F.R. § 240.10b–5. Schleibaum's trial commenced in June 1994. The government called twenty-nine witnesses over the course of seven days for its case-in-chief. Schleibaum's defense consisted of his testimony and that of Miniscribe's former director of far east operations. The jury convicted Schleibaum on both counts. The district court fined Schleibaum $6,000 and sentenced him to twenty-four months imprisonment on each count to run concurrently.

Defendant Quentin T. Wiles is the former chairman of the board and chief executive officer of Miniscribe. Wiles was charged in a three-count criminal indictment with making false statements to the government in violation of 18 U.S.C. § 1001, securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a) and 17 C.F.R. § 240.10b–5, and wire fraud in violation of 18 U.S.C. § 1343. Wiles' trial commenced in July 1994. The government called thirty-four witnesses over the course of eleven days for its case-in-chief. Wiles' defense consisted of twelve witnesses, including himself, over the course of two and one-half days. The jury convicted Wiles on all three counts. The district court fined Wiles $60,000 and sentenced him to thirty-six months imprisonment on each count to run concurrently.

Both Defendants appeal their convictions urging numerous grounds for reversal. Because both cases arise from the same fraudulent cover-up and present overlapping factual and legal issues, we have consolidated our disposition of these appeals. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm in part and vacate in part.

---

* Prior to release of the panel's opinion in these appeals, a majority of the court's active judges voted to rehear Part II.A. of the opinion en banc. For purposes of oral argument, the court consolidated these appeals with *United States v. Pappert*, No. 95–3071 (10th Cir., filed March 10, 1995), a portion of which the court also voted to rehear en banc. The en banc court now resubmits *Pappert* to the original panel for decision consistent with Part II.A. of this opinion.

** The late Honorable Oliver Seth, United States Senior Circuit Judge, heard oral argument and participated in the panel's conference of these appeals. Prior to his death, Judge Seth concurred in all but Part II.A. of the opinion. Judge Seth did not participate in that portion of the opinion, which was reheard en banc.

## I.

Miniscribe began operations in 1981 in Longmont, Colorado. Miniscribe was then a privately owned company manufacturing computer disk drives in the basement of its founder, Terry Johnson. Miniscribe went public in 1983, but soon grew beyond its capacity. In 1985, a venture capital group, Hambrecht & Quist, invested $20,000,000 in Miniscribe and gained control of its management. By 1986, Miniscribe was an overtly profitable, publicly-owned corporation with operations in Colorado, Hong Kong, and Singapore. Miniscribe, whose common stock was traded on the NASDAQ, was subject to the Securities Exchange Act of 1934, as well as the rules and regulations of the Securities and Exchange Commission (SEC).

Following its change in management, chairman of the board and chief executive officer Quentin T. Wiles headed Miniscribe from his office in Sherman Oaks, California. Wiles had a reputation as a successful, demanding executive who expected performance. Salaries and bonuses at Miniscribe often depended upon Miniscribe "making the numbers."

Assisting Wiles was a management team consisting largely of certified public accountants. Patrick J. Schleibaum initially served as Miniscribe's chief financial officer. Wiles' management team also included president, chief operating officer and board member Gerald Goodman, executive vice president Jesse C. Parker, director of far east operations Paul Lyons, division managers Owen P. Taranta and Warren Perry, and operations controllers Kenneth A. Huff and Steven Wolfe. William P. Lorea later joined Miniscribe as chief financial officer when, in the midst of trouble, Wiles moved Schleibaum to vice president. Wiles was in constant contact with his management team through phone calls and faxes, as many as fifteen of each, every business day.

### A.

Despite reported growth and profitability, Miniscribe's financial position began to deteriorate early in 1987. In January 1987, Miniscribe conducted its annual inventory count to determine the value of inventory on hand. The accuracy of the inventory count was critical to the proper preparation of Miniscribe's 1986 year end financial statements.

Management retained the independent accounting firm of Coopers & Lybrand to audit Miniscribe and verify the accuracy of its inventory count. The standard procedure for verifying a company's inventory count is through a test count—an inventory sampling deemed representative of the entire inventory. Problems arose when, unbeknownst to the auditors, management detected an inventory hole of between $2,000,000 and $4,000,000.

The inventory hole appeared because the actual inventory count, and thus dollar value of the inventory, was less than the value of the inventory recorded on Miniscribe's books. When the value of book inventory is overstated, the cost of goods sold is correspondingly understated. The understated cost of goods sold is then subtracted from net sales resulting in inflated profits equal to the amount of the inventory hole or overstatement.

Huff, Perry, and Wolfe discussed the problem with Schleibaum. At this point, Wiles was unaware of the inventory hole. Schleibaum properly decided to charge a portion of the hole against an emergency fund known as inventory reserves. The remainder of the hole also should have been charged off or expensed as a cost of goods sold with a corresponding reduction in profits. But when Perry suggested this approach, Schleibaum balked. Instead, Schleibaum directed his subordinates to conceal the remainder of the inventory hole through improper means so that Miniscribe could continue to "make the numbers."[1]

With Schleibaum's knowledge and approval, Wolfe and Perry decided to cover the inventory hole by falsely inflating the inventory count. To hide the false count from the auditors, Wolfe and Perry broke into the auditors' work trunks at Miniscribe after

---

1. For a good discussion of how income may be manipulated through inventory accounting, see Belverd E. Needles, Jr., *Financial Accounting* 360–62 (5th ed. 1995).

business hours and altered the test count to match the inflated inventory count. The inflated numbers were then entered into Miniscribe's computer system and reflected as additional inventory. Schleibaum signed a management representation letter to the auditors indicating Miniscribe's financial statements were accurate, including its inventory valuation. Miniscribe cleared the 1986 audit.

Miniscribe reported the false profits resulting from concealment of the inventory hole on its 1986 income statement and 1987 first quarter earnings statement. Miniscribe disseminated this information to the public through its 1986 annual report and 1987 first quarter financial report. Schleibaum signed the 1986 10–K report and 1987 first quarter 10–Q report which contained Miniscribe's false financial statements. Miniscribe filed the 10–K and 10–Q reports with the SEC as required by law. Miniscribe's reported success allowed the company to raise funds through a $97,000,000 issue of debentures early in 1987.

## B.

In the spring 1987, Wiles became concerned about Miniscribe's internal controls and financial strength. At management's quarterly meeting in July 1987, Parker expressed concern to Wiles about inventory control in Miniscribe's far east operations. In August 1987, Wiles traveled to the far east to review Miniscribe's operations in Hong Kong and Singapore. Wiles found a complete loss of inventory control in Miniscribe's Singapore facility. Wiles largely blamed Schleibaum for the loss of inventory control. Upon his return, Wiles moved Schleibaum to vice president and made Taranta acting chief financial officer.

Wiles believed that if an inventory problem actually existed, Miniscribe and its officers might be liable to those investors purchasing the recently issued debentures on the company's reported financial strength. At Wiles' direction, Taranta and Huff researched the inventory problem. In the fall of 1987, Taranta and Huff detected a $15,000,000 inventory hole at Miniscribe, the largest portion of which was located in the company's Colorado operation. At this point, Miniscribe's financial statements for 1986 and the first two quarters of 1987 should have been restated to reflect a write off of the inventory hole and consequent reduction in profits. Instead, on October 12, 1987, Miniscribe filed a third quarter 10–Q report with the SEC which failed to account for the problem.

On October 14, 1987, Miniscribe's management team met at Wiles' office in Sherman Oaks, California. Those present included Wiles, Schleibaum, Goodman, Parker, Taranta, and Huff. Directly prior to the meeting, Goodman informed Wiles of the inventory problem. Wiles became visibly upset, blaming Schleibaum and Goodman for failing to control operations. Wiles told Schleibaum and Goodman to stay out of the way; Wiles and Taranta would find a solution to the problem.

At the meeting, Taranta presented a report which he and Huff had completed the previous evening. The report set forth a detailed analysis of the inventory hole. In the report, Taranta proposed to cover nearly $8,000,000 of the hole through various means. Wiles rejected the idea, telling Taranta and the others to "think big chunks." Wiles suggested "grossing up" or adding value to the inventory. Schleibaum suggested increasing the value of fixed assets or failing to record certain liabilities. Taranta rejected these suggestions because the independent auditors might detect such measures. Without deciding the specifics, Wiles concluded that management should hide the inventory hole for the present time. Wiles directed Taranta to destroy all copies of the report. Shortly thereafter, Schleibaum, Huff, and Taranta met to discuss the details of the cover-up.[2]

In late October 1987, the stock market declined sharply. Miniscribe's reserves were minimal and unable to absorb a large inventory write off without affecting profits. Lorea, who Wiles had recently hired to become

---

**2.** After meeting with Wiles, members of management generally would prepare "What I Heard" memos and deliver them to Wiles. This way, Wiles could be sure that management understood his directions. Interestingly, no one attending the October 14, 1987 meeting prepared a "What I Heard" memo for Wiles.

Miniscribe's chief financial officer, nevertheless suggested that the time was proper to write off the inventory hole. Taranta and Goodman agreed. Because Miniscribe's stock value already was depressed, a reported decline in Miniscribe's profits was unlikely to affect its stock value significantly. Wiles rejected the idea. Instead, Wiles convened a second meeting of management in November 1987 to discuss the inventory problem.

Wiles, Schleibaum, Taranta, Goodman, Huff and Lorea attended the second meeting on November 17, 1987 in San Francisco at the offices of Hambrecht & Quist, which continued to control Miniscribe. The group discussed the upcoming 1987 audit. Wiles used extremely harsh language when addressing the inventory problem. Wiles had decided that Miniscribe could not afford to write off the inventory hole in 1987, but instead had to cover it up to maintain investor confidence. Wiles planned to write off the inventory hole over six quarters, beginning with the first quarter of 1988. Wiles concluded the meeting by scanning the conference table, stopping at Schleibaum, and stating to Taranta: "Owen, if anyone doesn't cooperate, or anyone gets in the way, you let me know and I'll deal with it."

In December 1987, independent auditors began preparing for Miniscribe's 1987 year end audit. Miniscribe again faced the problem of clearing the independent audit. Taranta and Lorea met with Wiles in California on December 4, 1987, while enroute to review Miniscribe's far east operations. Taranta explained the plan to clear the audit to Wiles. At the conclusion of the meeting, Wiles informed Lorea that because of the inventory problem, Lorea would not have to sign Miniscribe's 1987 10–K Report. Schleibaum later confirmed this with Lorea. Around the same time, Wiles also told Goodman to stay clear of the problem because the government "wouldn't put a seventy year old man [Wiles] in jail." Upon their arrival in Singapore, Taranta and Lorea met with Schleibaum, Parker, Lyons, and others to again discuss the details of covering the inventory hole.

In mid-December 1987, Miniscribe's management, with Wiles' approval and Schleib-aum's assistance, engaged in an extensive cover-up which included recording the shipment of bricks as in-transit inventory. To implement the plan, Miniscribe employees first rented an empty warehouse in Boulder, Colorado, and procured ten, forty-eight foot exclusive-use trailers. They then purchased 26,000 bricks from the Colorado Brick Company.

On Saturday, December 18, 1987, Schleibaum, Taranta, Huff, Lorea and others gathered at the warehouse. Wiles did not attend. From early morning to late afternoon, those present loaded the bricks onto pallets, shrink wrapped the pallets, and boxed them. The weight of each brick pallet approximated the weight of a pallet of disk drives. The brick pallets then were loaded onto the trailers and taken to a farm in Larimer County, Colorado.

Miniscribe's books, however, showed the bricks as in-transit inventory worth approximately $4,000,000. Employees at two of Miniscribe's buyers, CompuAdd and CalAbco, had agreed to refuse fictitious inventory shipments from Miniscribe totalling $4,000,-000. Miniscribe then reversed the purported sales and added the fictitious inventory shipments into the company's inventory records.

Additionally, the officers employed other means to cover the inventory hole, including: (1) recording the shipment of nonexistent inventory from Colorado to the far east, (2) packaging scrap as inventory, (3) double counting inventory, and (4) failing to record payables upon the receipt of materials. These various means distributed the inventory hole throughout Miniscribe's three facilities making the problem more difficult for the independent auditors to detect.

Again, Schleibaum signed a management representation letter to the auditors stating Miniscribe's 1987 financial reports were accurate and truthful. Miniscribe cleared the independent audit. The result of the cover-up was that, for 1987, Miniscribe's book inventory and reported profits were overstated by approximately $15,000,000 and $22,000,000 respectively.[3] These figures represented

---

**3.** Consistent with accounting principles, $15,- 000,000 of Miniscribe's reported profits was at-

17% of Miniscribe's inventory and 70% of its profits for the year. Despite Wiles' and Schleibaum's earlier representations, Wiles directed Lorea to sign Miniscribe's 1987 10–K report to the SEC.

For the year 1987, Miniscribe reported a 96% increase in revenues over 1986. Profits before taxes were $33,000,000, a 44% increase over 1986. Miniscribe's net income increased 37% to 82 cents per share, as compared with 63 cents per share in 1986. Stockholders equity reportedly increased 53%. Wiles' announcement to stockholders in Miniscribe's 1987 annual report stated: "We achieved the best results in the company's history and now have ten consecutive quarters of increased revenues and earnings .... 1987 was a great year and the outlook for 1988 looks even better." Press releases and ads appearing in the Wall Street Journal touted Miniscribe's reported success.

### C.

But 1988 saw Miniscribe's house of cards collapse. As Wiles had planned, Miniscribe wrote off $7,000,000 of the inventory hole over the first three quarters of 1988. Wiles planned to write off an additional $3,000,000 of the inventory hole in the fourth quarter of 1988, and the remainder over the first two quarters of 1989. Due to market conditions resulting in poor returns, however, Wiles directed management to write off only $600,-000, attributable to Hong Kong operations, in the fourth quarter. Thus, Miniscribe had written off only $7,600,000 of a planned $10,-000,000 write off in 1988.

Meanwhile, a significant downturn in the market for hard disk drives during the third quarter of 1988 had concerned Miniscribe's principal lender, Bank of America. Miniscribe had a fully extended $35,000,000 revolving credit agreement with Bank of America. The bank rejected Miniscribe's request for further credit. About that time, however, Standard Chartered Bank of London (SCB) approached Miniscribe about a lending relationship.

Officers from SCB met with Wiles in July 1988. Wiles delivered Miniscribe's false financial reports to SCB. Based upon the reports, Miniscribe's projected outlook, and Wiles' representations, SCB extended Miniscribe $90,000,000 in credit, $60,000,000 of which Miniscribe used as working capital. SCB perfected a security interest in Miniscribe's inventory and receivables. On September 6, 1988, SCB satisfied Miniscribe's $30,000,000 indebtedness to Bank of America with a wire fund transfer through the Federal Reserve Bank of Chicago. On November 15, 1988, and again on January 3, 1989, Wiles met with officials from SCB to request additional credit of $30,000,000. SCB rejected Wiles' request. SCB eventually lost $30,-000,000 to Miniscribe as a result of the cover-up.

Under increasing pressure, Schleibaum resigned as an officer of Miniscribe in June 1988. The next month, Schleibaum accepted a position with Sunward Technologies, a parts supplier to Miniscribe. During his tenure with Miniscribe, Schleibaum obtained approximately 116,000 shares of company stock at an approximate cost of $305,000.00. Schleibaum obtained his shares at a price significantly less than market through incentive stock options related to Miniscribe's performance, and through the company's employee stock purchase plan. As a top executive of a publicly-traded company, Schleibaum was well aware of the SEC's prohibition on insider trading. Nevertheless, between August 11, 1987 and January 26, 1989, Schleibaum sold every share of Miniscribe he owned. Schleibaum's gross profits totalled $775,940.00.

Miniscribe's board of directors convened in Colorado on December 1, 1988. Wiles suggested to board member William Hambrecht of Hambrecht & Quist, whom Wiles had informed of the inventory hole in January 1988, that Miniscribe report a $40,000,000 loss in the fourth quarter of 1988. Hambrecht rejected the idea, suggesting that such a report would force Miniscribe's entire board of directors to resign. Instead, Miniscribe re-

---

tributable to the $15,000,000 inventory hole, without adjustment for taxes. The remaining

$7,000,000 of profits was attributable to other adjustments such as unrecorded liabilities.

ported a $14,000,000 loss for the final quarter of 1988.

At this point, the outside directors, excepting Hambrecht, remained unaware of the scheme to cover the inventory hole. At the meeting, Goodman submitted a report to the board which summarized the company's condition. The report used phrases such as "weak cash position," "weak balance sheet," "cash flow negative," "living on old products," "not as profitable as required," and "out of control." A dispute arose between board members Wiles, Goodman, and Russell Planitzer. Goodman and Planitzer wanted to issue a press release informing the public of Miniscribe's weak condition. Wiles reluctantly agreed over Planitzer's threat to resign from the board.

### D.

In January 1989, Wiles began spending more time at Miniscribe's headquarters in Longmont, Colorado. Wiles' plan was first to stabilize the company, then improve its performance. On January 3, 1989, Wiles sent Goodman a memo stating that in the future, "we will make not fake our numbers." But by this time, Miniscribe's outlook was hopeless. Wiles had lost control. Goodman, Parker and Lorea, among others, noted Wiles' distress. Wiles resigned his position as Miniscribe's chief executive officer and chairman of the board on February 22, 1989.

Between 1985 and 1989, Wiles had acquired 780,517 shares of Miniscribe's common stock and 1,724 shares of the company's preferred stock. Wiles had initially invested $1,500,000 in Miniscribe in 1985 as part of Hambrecht & Quist's takeover. Thereafter, he received discounted shares through warrants and stock options. Between April 27, 1988 and May 11, 1988, less than one year prior to his resignation, Wiles sold 150,000 shares of Miniscribe's common stock for $1,700,000. Wiles' profit before taxes and commissions amounted to $1,400,000. Wiles retained over 600,000 shares of Miniscribe's stock which eventually became worthless.

Richard Rifenburgh became Miniscribe's new chairman of the board and chief executive officer upon election at the February 22,

1989 board meeting. Shortly thereafter, Rifenburgh directed Parker to perform an inventory analysis. Parker informed Rifenburgh of the inventory hole and its cover-up. With the board's approval, Rifenburgh established an independent evaluation committee to investigate the matter.

On April 3, 1989, Rifenburgh issued a press release informing the public that Miniscribe's past financial reports could not be relied upon and that the company would delay releasing its 1988 financial reports pending the results of the investigation. Taranta resigned shortly thereafter. Miniscribe filed an incomplete 1988 10–K report with the SEC that same month. In December 1989, Miniscribe released corrected financial statements for 1986, 1987, 1988, and the first half of 1989. Early in 1990, Miniscribe filed for bankruptcy. NASDAQ delisted Miniscribe's common stock in February 1990.

During the investigation, both Wiles and Schleibaum contacted members of Miniscribe's prior management team and urged them to reveal nothing. Schleibaum told Wolfe that if no one said anything only innuendo would exist. Schleibaum gave Wolfe the "shush" sign. Similarly, Wiles phoned Goodman to ask him and Lorea to say that management had done nothing illegal.

### E.

A grand jury indicted Wiles and Schleibaum separately in March 1993. The indictment against Wiles alleged his participation in a scheme to defraud the SEC, SCB, and Miniscribe's shareholders and investors. The indictment alleged that Wiles joined the scheme in August 1987, when he instructed Taranta and Huff to research Miniscribe's inventory problem. According to the indictment, Wiles participation in the scheme ended in March 1989 after he instructed Goodman and Lorea not to incriminate anyone.

The indictment against Schleibaum similarly alleged his participation in a scheme to defraud the SEC and Miniscribe's shareholders and investors. The indictment alleged that Schleibaum joined the scheme in January 1987 when he learned of an inventory

hole at Miniscribe and instructed Wolfe and Perry to conceal it. Schleibaum's participation in the scheme allegedly continued until August 1989 when he told Wolfe not to reveal any wrongdoing.

Count one of the respective indictments charged Wiles and Schleibaum under 18 U.S.C. § 1001 with making Miniscribe's false 1987 10–K report and filing it with the SEC. The count alleged that the report's financial statements fraudulently overstated inventory, income before taxes, and net income for 1987.

Count two of the respective indictments charged Wiles and Schleibaum with securities fraud under 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b–5. Specifically, the count alleged that Defendants violated the securities laws by: (1) employing a scheme to defraud, (2) making untrue statements of material facts and failing to state material facts, and (3) engaging in deceitful acts and practices, all of which defrauded Miniscribe, its shareholders and investors.

A third count against Wiles alone charged him with wire fraud under 18 U.S.C. § 1343. Specifically, count three alleged that Wiles, in furtherance of a scheme to defraud, caused SCB to make interstate wire transfers from Chicago, Illinois in excess of $70,000,000 for Miniscribe's benefit.

## II.

On appeal, Wiles and Schleibaum present two common issues for our consideration. Both Defendants contend that: (1) the district court's failure to instruct the jury on materiality as an element of the false statements charges under 18 U.S.C. § 1001, constitutes reversible error under *United States*

**4.** Wiles and Schleibaum also challenge the sufficiency of the evidence which the government presented on the §·1001 false statements charges, specifically on the element of materiality. The district court overruled Defendants' respective objections as to the sufficiency of the evidence. As will become apparent, a discussion of the sufficiency of the evidence on the element of materiality is unnecessary given our analysis of this first issue.

**5.** Wiles raises two additional claims which he failed to raise in the district court: (1) the jury instructions as to the securities fraud charge

*v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), a decision rendered after Defendants' trials;[4] and (2) the securities fraud charges under 15 U.S.C. §§ 78j(b), 78ff(a) and 17 C.F.R. § 240.10b–5 were prejudicially duplicitous in that the charges alleged multiple means by which multiple false statements and acts constituted only one securities fraud scheme.

■ Additionally, Wiles and Schleibaum have preserved four separate issues for our review.[5] Wiles contends: (1) the government presented insufficient evidence of Wiles' knowledge of the fraudulent scheme to sustain his convictions under each of the three counts against him; (2) venue on the false statements charge under 18 U.S.C. § 1001 was improper in Colorado; and (3) the district court improperly admitted hearsay testimony as to the wire fraud charge under 18 U.S.C. § 1343 based on a "single scheme" theory. Schleibaum's sole individual contention is that Congress did not intend § 1001's general prohibition against making false statements to the government to apply to false SEC filings in view of 15 U.S.C. § 78ff, which specifically prohibits making false statements to the SEC.

We discuss each issue in turn.

## A.

Wiles and Schleibaum first assert that the district court's failure to instruct the respective juries on materiality as an element of the false statements charges under 18 U.S.C. § 1001, constitutes error warranting reversal of their § 1001 convictions. Section 1001 provides:

improperly expanded the grand jury's indictment; and (2) the unanimity instruction as to the wire fraud charge was equivocal; both in violation of the Fifth Amendment. Applying the plain error analysis set forth in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), we conclude that Wiles claims do not constitute plain error and thus, he has waived his right to present these claims on appeal. *See United States v. Lira–Arredondo,* 38 F.3d 531, 533 n. 2 (10th Cir.1994) (to preserve error, party generally must make timely objection stating specific grounds therefore).

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1001. Count I of the respective indictments charged Wiles and Schleibaum under the second and third clauses of § 1001. The indictments alleged that both Defendants "did knowingly and willfully make and cause to be made false, fictitious and fraudulent statements and a false writing and document, that is, Miniscribe's Form 10–K Report for fiscal year 1987, submitted to the SEC."

While the second and third clauses of § 1001 do not expressly make materiality an element of the offense, we have held since 1960 that materiality is an element of any § 1001 offense. *Gonzales v. United States,* 286 F.2d 118 (10th Cir.1960), *cert. denied,* 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961).[6] Prior to *United States v. Daily,* 921 F.2d 994 (10th Cir.1990), *cert. denied,* 502 U.S. 952, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991), the government had the burden of proving to the jury the element of materiality beyond a reasonable doubt. In *Daily,* however, we overruled our prior precedent and held that materiality under § 1001 was a question of law for the court, "with an attendant reduction of the government's burden of proof on this issue." *Id.* at 1003 n. 9 & 1004. At the time of Wiles' and Schleib-

aum's respective trials, *Daily* was still the law of this circuit. Without objection, the district court concluded that materiality was a question of law consistent with binding precedent. The court also concluded, over Defendants' respective objections, that the government met its burden by producing "some evidence" of the false statements' materiality. The court did not indicate what evidentiary burden it applied in reaching this conclusion.

During the pendency of these appeals, the Supreme Court decided *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). The Court reasoned that a defendant has a right under the Fifth and Sixth Amendments, U.S. Const. amend. V & VI, to have a jury determine guilt beyond a reasonable doubt on every element of a charged offense. The Constitution "require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at ——, 115 S.Ct. at 2313. Because materiality is an element of a § 1001 charge, the jury, not the court, must find materiality. *Id.* at ——, 115 S.Ct. at 2314.[7] Obviously, *Gaudin* overruled our prior precedent to the contrary. Wiles and Schleibaum now assert that the district court improperly decided materiality under § 1001 as a question of law in violation of their right to a jury trial. U.S. Const. amend. V & VI.

### 1.

The district court's failure to instruct the respective juries on materiality as an element of a § 1001 offense undoubtedly constitutes error under *Gaudin.* Unless a legal rule is waived, any deviation from the

---

**6.** The Supreme Court has granted certiorari in *United States v. Wells,* 63 F.3d 745 (8th Cir. 1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996), to decide whether materiality is an element of an offense under 18 U.S.C. § 1014. Section 1014 proscribes the making of "any false statement or report . . . for the purpose of influencing in any way" an FDIC insured institution. The materiality element of § 1014 is directly in issue in *United States v. Pappert,* No. 95–3071 (10th Cir., filed March 10, 1995), which was consolidated with these appeals for en banc argument on the materiality issue. Because § 1014 is similar but not identi-

cal to § 1001, the Supreme Court's discussion of materiality in *Wells* as an element of a § 1014 offense *may,* but will not necessarily, affect our determination that materiality is an element of any § 1001 offense.

**7.** In *Gaudin,* the Court did not address the issue of whether materiality is an element of any § 1001 offense. Rather, the parties agreed that materiality was an element of any false statements offense under § 1001. *Gaudin,* —— U.S. at ——, 115 S.Ct. at 2313.

rule is error. *United States v. Olano,* 507 U.S. 725, 732–33, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993). Waiver is the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).[8] Wiles and Schleibaum did not intentionally relinquish or abandon their right to have a jury determine beyond a reasonable doubt all elements of the § 1001 charges. At the time of their trials, they were not aware of this right. *See* Fed.R.Crim.P. 51 ("if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice that party").

■■■ The district court's treatment of materiality as a question of law under § 1001 was quite consistent with the law prevailing at the time of trial. In *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987), however, the Supreme Court established that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final."[9] *Gaudin* sets forth a constitutional rule which requires the government in a § 1001 prosecution to prove materiality to the jury beyond a reasonable doubt. *Gaudin* overrules the prior law of this circuit and places a higher burden of proof upon the government than previously when courts deemed materiality a question of law. *See Daily,* 921 F.2d at 1003 n. 9 & 1004. We therefore conclude that *Gaudin* must be applied retroactively in accordance with *Griffith.*

### 2.

Our next task is to determine the nature of the error, that is, the district court's failure to instruct the respective juries on materiality as an element of the § 1001 charge. In a direct criminal appeal, we generally review error committed in the district court under Fed.R.Crim.P. 52:

### Rule 52. Harmless Error and Plain Error

**(a) Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

**(b) Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

■■■ According to the plain language of Rule 52, we must determine whether the error affected substantial rights under either harmless or plain error analysis. This means "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano,* 507 U.S. at 734, 113 S.Ct. at 1777. The inquiry is the same under either subsection (a) or (b) "with one important difference." *Id.* Where a defendant has posed a timely objection to the error, the government bears the burden of proving a lack of prejudice under Rule 52(a)'s harmless error analysis. Where a defendant has failed to pose a timely objection to the error, the defendant bears the burden of proving prejudice under Rule 52(b)'s plain error analysis. *Id.* Under either approach, however, we must be able to determine whether the error affected a defendant's substantial rights in order to apply Rule 52. In other words, we must be able to evaluate the effect of the error on the reliability of the jury verdict. *See Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Trial error which occurs

---

**8.** Forfeiture, as opposed to waiver, is the failure to make the timely assertion of a right. *Olano,* 507 U.S. at 733, 113 S.Ct. at 1777.

**9.** The only exception to this rule, inapplicable here, is where the retroactive application of a new rule for the conduct of criminal prosecutions would raise "due process concerns analogous to the ex post facto limitations on the retroactive application of criminal statutes." *United States v. Morehead,* 959 F.2d 1489, 1511 (10th Cir.1992). The Ex Post Facto Clause protects criminal defendants against legislative enact-

ments that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *California Dept. of Corrections v. Morales,* —— U.S. ——, ——, 115 S.Ct. 1597, 1601, 131 L.Ed.2d 588 (1995). The Due Process Clause of the Fifth and Fourteenth Amendments protects criminal defendants against analogous judicial action. Thus a court does not apply a newly announced judicial rule where the new rule either: (1) retroactively alters the definition of a crime; or (2) increases the punishment for an offense. *Id.*

during presentation of the case to the jury may "be quantitatively assessed in the context of the other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991).

▮ Although the rare exception, not every error in a criminal trial may be quantitatively assessed in the context of the other evidence, and thus, not every error requires a showing of prejudice or lack thereof. The Supreme Court has recognized a "special category" of errors which must be corrected regardless of their effect on the outcome of the case. *Olano,* 507 U.S. at 735, 113 S.Ct. at 1778. The Supreme Court has labeled this category of errors as "structural." *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265. A structural error in a criminal trial always requires reversal of a conviction because such error renders the trial an unreliable vehicle for the determination of guilt. *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986). Structural error constitutes a "defect[ ] in the constitution of the trial mechanism" which defies analysis under Fed.R.Crim.P. 52. *Fulminante,* 499 U.S. at 309, 111 S.Ct. at 1265. Structural error affects the "framework within which the trial proceeds, rather than simply ... the trial process itself." *Id.* at 310, 111 S.Ct. at 1265. Structural error creates "consequences that are necessarily unquantifiable and indeterminate." *Sullivan,* 508 U.S. at 282, 113 S.Ct. at 2083.

Wiles and Schleibaum suggest that the district court's failure to instruct the juries on the element of materiality falls within that "special category" of errors that does not require a showing of prejudice, but must be corrected regardless of their outcome on the case, that is, they argue, the error is "structural." Because of the importance of the issue and the widely differing views among our sister circuits, *see* notes 12 & 13 *infra,* we decide as an en banc court whether the district court's failure to instruct the respective juries on the element of materiality under 18 U.S.C. § 1001 constitutes structural error, and, if so, whether that error is reversible per se or subject to plain error analysis.

a.

▮ A "strong presumption" exists that even constitutional violations may be "harmless." *Rose,* 478 U.S. at 579, 106 S.Ct. at 3106. The Court on numerous occasions has held constitutional errors harmless. *See Fulminante,* 499 U.S. at 306–07, 111 S.Ct. at 1263 (listing cases). Moreover, the Court has held in a number of decisions that constitutionally infirm jury instructions may be harmless. *See Yates v. Evatt,* 500 U.S. 391, 402, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (unconstitutional burden-shifting jury instruction); *Carella v. California,* 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (jury instruction containing erroneous mandatory presumption on element of intent); *Pope v. Illinois,* 481 U.S. 497, 502–04, 107 S.Ct. 1918, 1921–23, 95 L.Ed.2d 439 (1987) (jury instruction misstating element of the offense); *Rose,* 478 U.S. at 581–82, 106 S.Ct. at 3107–08 (jury instruction containing erroneous rebuttable presumption on element of malice).

▮ The general rule that constitutional error may be harmless, however, is subject to the exception for structural error. The Supreme Court has held that some constitutional violations are not susceptible to harmless error analysis under Fed.R.Crim.P. 52(a) because they are "structural," and thus presumed prejudicial. Structural errors "affect[ ] the framework within which the trial proceeds" and render the trial fundamentally unfair. *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265. Without certain basic or "structural" protections, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose,* 478 U.S. at 577–78, 106 S.Ct. at 3106. Examples of structural errors are exclusion of individuals from a grand jury based on race, *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), denial of the right to self-representation, *McKaskle v. Wiggins,* 465 U.S. 168, 177–78 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984), denial of the right to a public trial, *Waller v. Georgia,* 467 U.S. 39, 49 n. 9, 104 S.Ct. 2210, 2217 n. 9, 81 L.Ed.2d

31 (1984), a petit jury's improper selection, and exposure to pretrial publicity, *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), denial of the right to counsel, *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) and *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978), and potentially biased judges, *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

In *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court unanimously held that a constitutionally-deficient reasonable doubt instruction was structural. The Court reasoned that "where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings," no jury verdict of beyond-a-reasonable-doubt exists upon which to base a harmless error analysis. *Id.* at 281, 113 S.Ct. at 2082 (emphasis in original). The Court continued:

> There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object,* so to speak, upon which harmless error scrutiny can operate. The most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that that jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual finding of guilty.

*Id.* at 280, 113 S.Ct. at 2082 (emphasis in original) (citations omitted). The Court concluded: "The deprivation of that right [to be found guilty beyond a reasonable doubt of every element of an offense], with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" *Id.* at 281–82, 113 S.Ct. at 2083.

b.

As a matter of historical development, the concept of structural error arose in cases where criminal defendants objected at trial to a specific error, and thus, the courts examined the error under the harmless error doctrine. The reason why structural error defies harmless error analysis under Fed. R.Crim.P. 52(a), however, is the same reason why structural error defies plain error analysis under Rule 52(b). The Supreme Court has expressly stated that structural error at trial *requires reversal.* In *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the Supreme Court "recognized that some constitutional errors *require reversal without regard to the evidence in the particular case.*" *Rose,* 478 U.S. at 577, 106 S.Ct. at 3105 (emphasis added) (citing *Chapman,* 386 U.S. at 23 n. 8, 87 S.Ct. at 828 n. 8). Similarly, in *Sullivan,* 508 U.S. at 279, 113 S.Ct. at 2081, the Court noted that some constitutional errors "will *always* invalidate the conviction." (emphasis added). A defendant "may assuredly insist upon observance of ... [structural] guarantee[s] even when the evidence against him is so overwhelming to establish guilt beyond a reasonable doubt." *Carella,* 491 U.S. at 268, 109 S.Ct. at 2422 (Scalia, J., concurring). *E.g., Vasquez,* 474 U.S. at 263, 106 S.Ct. at 623 (when judge has financial interest in conviction, "reversal required" despite any showing of actual bias, citing *Tumey,* 273 U.S. at 535, 47 S.Ct. at 445); *Id.* (when petit jury selected upon improper criteria or exposed to prejudicial publicity, Court has "required reversal," citing *Sheppard,* 384 U.S. at 351–52, 86 S.Ct. at 1516); *Holloway,* 435 U.S. at 489, 98 S.Ct. at 1181 (when defendant is deprived of counsel, "reversal is automatic," citing *Gideon,* 372 U.S. 335, 83 S.Ct. 792). Reversal is required because structural error is a "fundamental flaw[ ]" in the trial process and *"undermines the structural integrity of the criminal tribunal itself."* *Vasquez,* 474 U.S. at 263–64, 106 S.Ct. at 623 (emphasis added). Due to the nature of structural error, whether a defendant objects (as required for Rule 52(a) analysis) or fails to object (as required for Rule 52(b) analysis) to such error at trial is simply irrelevant.

**1058**

■ In his *Gaudin* concurrence, Chief Justice Rehnquist noted that the government did not argue, and the Court did not address, the application of Rule 52 to the trial court's failure to instruct the jury on materiality under 18 U.S.C. § 1001. *Gaudin,* —— U.S. at ——, 115 S.Ct. at 2321 (Rehnquist, C.J., concurring). The central question in the present appeals, unaddressed in *Gaudin,* is into which category the district court's failure to instruct on the element of materiality belongs: Is the error non-structural and subject to analysis under Fed.R.Crim.P. 52, or is the error structural and presumed to render Defendants' convictions under 18 U.S.C. § 1001 fundamentally unfair absent a showing of prejudice? We believe Supreme Court precedent requires us to conclude that the district court's failure to instruct the respective juries on the element of materiality is structural and requires us to vacate Defendants' § 1001 convictions.[10]

c.

■■ The Fifth Amendment requires the federal government to prove beyond a reasonable doubt that a defendant is guilty of every contested element of a crime. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). The Sixth Amendment requires "as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of guilty." *Sullivan,* 508 U.S. at 277, 113 S.Ct. at 2080. Together, these rights mean that a criminal conviction must rest on a jury determination that the accused "is guilty of every element of the crime with which he is

charged beyond a reasonable doubt." *Gaudin,* —— U.S. at ——, 115 S.Ct. at 2313. The Supreme Court's statement in *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), regarding a trial court's failure to instruct the jury on an element of a crime, follows directly from this analysis:

> A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence.... *Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the offense.*

*Id.* at 384–85, 106 S.Ct. at 696 (emphasis added).

To affirm Defendants' convictions under 18 U.S.C. § 1001 where the contested element of materiality was not submitted to the juries not only would deny Defendants important constitutional guarantees, but also would require us in undertaking harmless or plain error analysis to "engage in pure speculation—[our] view of what a reasonable jury would have done." *Sullivan,* 508 U.S. at 281, 113 S.Ct. at 2082. But if we did that, "'the wrong entity [would] judge the defendant[s] guilty.'" *Id.* (quoting *Rose,* 478 U.S. at 578, 106 S.Ct. at 3106). The Defendants' right to a jury trial with the accompanying right to be found guilty beyond a reasonable doubt of every element of § 1001 is a "structural guarantee" that—

> "reflect[s] a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and

---

**10.** A situation may arise when a reviewing court may conclude with complete confidence that a failure to instruct on an element of an offense did not play a role in the jury's verdict on that offense. This is exactly what we concluded recently in *United States v. Mason,* 85 F.3d 471 (10th Cir.1996), wherein we stated:

> When the only evidence *tends* to establish an elemental fact, or when the parties stipulate to evidence *tending* to establish an elemental fact, the jury must still resolve the existence or nonexistence of the fact sought to be proved. In contrast, the jury need not resolve the existence of an element when the parties have stipulated to the facts which establish that element. In the latter circumstance, the judge has not removed the consideration of an issue from the jury; the parties have. More specifi-

cally, by stipulating to elemental facts, a defendant waives his right to a jury trial on that element.

*Id.* at 472 (emphasis added). Thus, where a defendant at trial stipulates to facts establishing the element and effectively takes consideration of that element from the jury, a court might properly conclude that no error occurred from the failure to instruct. *See Connecticut v. Johnson,* 460 U.S. 73, 87, 103 S.Ct. 969, 977–78, 74 L.Ed.2d 823 (1983) (plurality opinion) (failure to properly instruct jury on an element of an offense may be harmless where defendant conceded existence of element). Because both Wiles and Schleibaum contested the element of materiality at their respective trials, we are not confronted with that situation.

liberty of the citizen to one judge or to a group of judges." *A defendant may assuredly insist upon observance of this guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt.* *Carella,* 491 U.S. at 268, 109 S.Ct. at 2422 (Scalia, J., concurring) (emphasis added). In other words, " 'the question is not whether guilt may be spelt out of a record, but whether guilt has been found by a jury according to the procedure and standards appropriate for criminal trials.' " *Id.* at 269, 109 S.Ct. at 2422 (quoting *Bollenbach v. United States,* 326 U.S. 607, 614, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946)).

These appeals present a problem unlike those cases where the trial court instructs a jury to presume an element of the offense from underlying predicate facts. In those instances, the error may be harmless. *E.g., Rose,* 478 U.S. at 580–81, 106 S.Ct. at 3107–08. The question is whether the jury based its verdict on evidence establishing the presumed element beyond a reasonable doubt, independent of the presumption. *Yates,* 500 U.S. at 404, 111 S.Ct. at 1893. The predicate facts may conclusively establish the existence of the element to be presumed so that no rational jury could find the predicate facts without also finding the presence of the element. *See Pope,* 481 U.S. at 502–503, 107 S.Ct. at 1922. Such a presumption then may play no significant role in the jury's findings. *Sullivan,* 508 U.S. at 281, 113 S.Ct. at 2082. A Rule 52 standard that looks at the question of whether the jury necessarily found the element to be satisfied based upon underlying findings of fact, rather than what a hypothetical jury might have found, places the determination of the element in the "right entity"—the jury. In other words, if the element-specific error did not prevent the jury from rendering a verdict on that element, an "object" remains upon which harmless or plain error scrutiny can operate, and thus the error is not structural. *See Sullivan,* 508 U.S. at 280, 113 S.Ct. at 2082.

But the essential connection between a presumption and underlying predicate facts is not present where the error consists of the failure to instruct on an element of a crime in its entirety. *See id.* When an instructional error affects a single element, the proper "object" of focus is the jury's verdict on that element. If, as here, the element-specific error, i.e. the instructional omission, prevents the jury from rendering a verdict on an element entirely, no "object" exists upon which harmless or plain error analysis can operate. To conclude the error was harmless or not plain would be the same as directing a verdict on the element—both would prevent an actual jury verdict on that element. Supreme Court precedent precludes us from "conduct[ing] a subjective inquiry into the juror's minds" in order to uphold a conviction. *Yates,* 500 U.S. at 404, 111 S.Ct. at 1893; *see also Sullivan,* 508 U.S. at 278–81, 113 S.Ct. at 2080–83; *Yates,* 500 U.S. at 402–06, 111 S.Ct. at 1892–94; *Rose,* 478 U.S. at 576–79, 106 S.Ct. at 3105–07.[11]

The Supreme Court very recently shed further light on the proper manner in which to analyze structural error. In *California v. Roy,* —— U.S. ——, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996), a California state court instructed a jury that in order to find the defendant guilty of robbery and murder as an aider and abettor, the jury must find the defendant helped the principal "with knowl-

---

11. We are not confronted with a situation where a failure to instruct on an element of a crime as to one count of the indictment might taint convictions on remaining counts. *See United States v. Pettigrew,* 77 F.3d 1500, 1511–12 (5th Cir. 1996) (failure to instruct on substantive count necessarily tainted instructions on conspiracy count); *United States v. Nash,* 76 F.3d 282, 285–86 (9th Cir.1996) (failure to instruct on false statements charge necessarily tainted instructions on bank fraud charge); *United States v. Johnson,* 71 F.3d 139, 145–46 (4th Cir.1995) (erroneous instruction in first count incorporated by reference into second count necessarily taint-ed convictions on both counts). Each count of the respective indictments against Wiles and Schleibaum charged them with separate and distinct substantive crimes. The district court's failure to instruct on the element of materiality under § 1001 had no bearing upon the instructions which the court tendered on the remaining counts. *Cf. United States v. Winstead,* 74 F.3d 1313, 1320 (D.C.Cir.1996) (conviction on mail fraud charge which required jury to find element of materiality sufficient to satisfy court that jury would have found same statements material on § 1001 charge).

edge of" the principal's unlawful purpose. The California Supreme Court subsequently held in another case that the instruction was error because it failed to include the requirement that defendant intended to encourage or facilitate the crimes. On collateral review, the Supreme Court noted:

> The specific error at issue here—an error in the instruction that defined the crime—is ... as easily characterized as a 'misdescription of an element' of the crime, as it is characterized as an error of 'omission.' No one claims that the error at issue here is of the 'structural sort' that defies analysis by 'harmless error' standards.

*Id.* at ——, 117 S.Ct. at 339 (internal citations and quotations omitted). The Court remanded for a determination of whether the error could be considered harmless under the standard established in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), namely, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Roy,* —— U.S. at ——, 117 S.Ct. at 338 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)).

Justice Scalia joined the Court's opinion but wrote separately to explain "what constitutes the harmlessness to which ... [the] standard is applied." *Roy,* —— U.S. at ——, 117 S.Ct. at 339 (Scalia, J., concurring). Relying upon *Sullivan,* 508 U.S. at 279–80, 113 S.Ct. at 2082, and *Gaudin,* —— U.S. at —— ——, 115 S.Ct. at 2319–20, Justice Scalia explained:

> [A] criminal defendant is constitutionally entitled to a jury verdict that he is guilty

of the crime, and absent such a verdict the conviction must be reversed no matter how inescapable the findings to support that verdict might be. A jury verdict that he is guilty of the crime means, of course, a verdict that he is guilty of each necessary element of the crime....

> The error in the present case can be harmless only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well.

*Roy,* —— U.S. at —— ——, 117 S.Ct. at 339–40 (Scalia, J., concurring) (internal citations and quotations omitted).

 Thus, structural error is not limited to situations where a constitutional error affects "the entire conduct of the trial from beginning to end" *Fulminante,* 499 U.S. at 309–10, 111 S.Ct. at 1265. Rather, structural error can exist where a constitutional error affects a single element and causes the absence of a verdict on that element. *See Roy,* —— U.S. at —— ——, 117 S.Ct. at 339–40 (Scalia, J. concurring). Because the respective juries in the cases before us did not render a verdict, formal or otherwise, against Wiles or Schleibaum on the element of materiality, we hold that the district court's failure to instruct the juries as to the element of materiality under 18 U.S.C. § 1001 on Count I of the respective indictments is "structural" error and falls within that "special category of forfeited errors" that does not require a showing of prejudice, but rather, *must be corrected.*[12] *Olano,* 507 U.S. at 735, 113

---

**12.** To assist in our analysis, we reviewed recent circuit decisions where the district court failed to instruct on a matter that the Supreme Court subsequently held was a factual element of the charged offense. *United States v. Baumgardner,* 85 F.3d 1305, 1309–10 (8th Cir.1996); *United States v. DiRico,* 78 F.3d 732, 736–38 (1st Cir. 1996); and *United States v. Gaudin,* 28 F.3d 943, 951–52 (9th Cir.1994) (en banc), *aff'd,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), have held that a failure to instruct on an element of an offense *requires* reversal. *But see United States v. Keys,* 95 F.3d 874, 880–81 (9th Cir.1996) (en banc) (*Gaudin* error subject to harmless error review but reversal always required); *United States v. Raether,* 82 F.3d 192, 194 (8th Cir.1996) (*Gaudin* error subject to harmless error review and reversal not always required). The majority

of the decisions, however, engage, in differing degrees, in an analysis of the trial record to determine the existence of prejudice, with varying results. *E.g., United States v. Marder,* 48 F.3d 564, 569–71 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 1441, 131 L.Ed.2d 320 (1995) (failure to instruct on element of knowledge of unlawfulness on currency structuring offense not prejudicial); *Ianniello v. United States,* 10 F.3d 59, 62–65 (2d Cir.1993) (failure to instruct on requirement of relationship among predicate acts under RICO not prejudicial); *United States v. Retos,* 25 F.3d 1220, 1228–32 (3d Cir.1994) (failure to instruct on element of knowledge of unlawfulness on currency structuring offense prejudicial, but expressly declining to adopt per se rule that omission of essential element of offense consti-

S.Ct. at 1778. Because the error is structural, and thus not amenable to analysis under Fed.R.Crim.P. 52, or the discretion we possess thereunder, we vacate Defendants' § 1001 convictions under Count I of the respective indictments.[13]

B.

■ Wiles and Schleibaum also assert that the securities fraud charge contained in count two of the respective indictments against them was prejudicially duplicitous. According to Defendants, the juries may have found them guilty of securities fraud without having reached a unanimous verdict on the commission of a particular offense or act of securities fraud. The district court rejected Defendants' arguments. The court reasoned that a unanimity instruction would alleviate any possible jury confusion and ensure unanimous verdicts. We review de novo the question of whether an indictment is duplicitous. *United States v. Martin*, 4 F.3d 757, 759 (9th Cir.1993). We conclude that count two of the respective indictments was not duplicitous and that the unanimity instructions cured any prejudice to the Defendants.

■ Duplicity is defined as the joinder of two or more distinct and separate criminal offenses in the same count of an indictment. *United States v. Haddock*, 956 F.2d 1534, 1546 (10th Cir.), *reh'g in part*, 961 F.2d 933 (10th Cir.), *cert. denied*, 506 U.S. 828, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992). The dangers of duplicity are three-fold: (1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence. *United States v. Sasser*, 971 F.2d 470, 477 n. 5 (10th Cir.1992), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993). An indictment that alleges several means or methods of committing a single offense, rather than several separate offenses, however, is not necessarily duplicitous. *United States v. Jaynes*, 75 F.3d 1493, 1502 n. 7 (10th Cir.1996); *United States v. Browning, Inc.*, 572 F.2d 720, 725 (10th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 88, 58 L.Ed.2d 114 (1978).

■ In these cases, count two alleged that as part of the fraudulent scheme, Wiles and Schleibaum filed false reports with the SEC. The second count charged each Defendant with multiple fraudulent sales of Minis-

---

tutes plain error); *United States v. David*, 83 F.3d 638, 641–48 (4th Cir.1996) (failure to instruct on element of materiality on false statements charge prejudicial, but expressly declining to adopt per se rule that omission of essential element of offense constitutes plain error); *United States v. Rogers*, 18 F.3d 265, 267–68 (4th Cir.1994) (failure to instruct on element of knowledge of unlawfulness on currency structuring offense constitutes plain error, but not expressly labeling error as structural); *United States v. McGuire*, 79 F.3d 1396, 1400–05 (5th Cir.) (plurality) (failure to instruct on element of materiality on filing false IRS cash receipt form charge prejudicial), *reh'g en banc granted* 90 F.3d 107 (5th Cir.1996); *United States v. Parker*, 73 F.3d 48, 50–53 (5th Cir.1996) (failure to instruct on requirement of interstate nexus under Hobbs Act not prejudicial); *United States v. McGhee*, 87 F.3d 184, 185–88 (6th Cir.) (failure to instruct on element of materiality on false statement charge not prejudicial), *vacated and reh'g en banc granted* 95 F.3d 1335, (6th Cir.1996); *United States v. Jones*, 21 F.3d 165, 172–73 (7th Cir.1994) (failure to instruct on element of knowledge of unlawfulness on currency structuring offense prejudicial; "no evidence" on element presented); *United States v. Kramer*, 73 F.3d 1067, 1074–75 (11th Cir.1996)

(failure to instruct on element of materiality on perjury charge not prejudicial).

13. We disagree with those decisions which have labeled the failure to instruct the jury on an element of an offense as structural and presumed such failure to be prejudicial, but then proceeded to uphold the defendant's conviction under the fourth prong of the plain error analysis. *E.g.*, *United States v. Upton*, 91 F.3d 677, 685–86 (5th Cir.1996); *United States v. Jobe*, 90 F.3d 920, 923–24 (5th Cir.1996); *United States v. Randazzo*, 80 F.3d 623, 632 (1st Cir.1996); *United States v. Ross*, 77 F.3d 1525, 1540 (7th Cir.1996); *United States v. Allen*, 76 F.3d 1348, 1368 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 121, 136 L.Ed.2d 71 (1996). These decisions reason that where the evidence of a defendant's guilt is overwhelming, the defendant suffered no prejudice, and thus the failure to instruct did not "seriously affect the fairness, integrity or public reputation of judicial proceedings." As we have seen, however, structural error requires reversal in every instance because such error "undermines the structural integrity of the criminal tribunal itself." *Vasquez*, 474 U.S. at 263–64, 106 S.Ct. at 623.

cribe stock. Additionally, count two of the indictment against Wiles charged him with issuing numerous false mailings and press releases. Count two of the indictments was necessarily complex because the fraudulent scheme in which Defendants participated was complex, extending over the course of two years.

 But charging a single offense of securities fraud involving a multitude of ways and courses of action as a result of an ongoing scheme to defraud does not render that charge duplicitous. Fed.R.Crim.P. 7(c) permits the government to allege in a single count that the defendant committed an offense "by one or more specified means." *United States v. McKneely,* 69 F.3d 1067, 1072 (10th Cir.1995). We draw a distinction between an indictment that charges multiple offenses for distinct and separate criminal acts in the same count, and an indictment that charges multiple means of carrying out one offense associated with a continuing course of criminal conduct. *Browning,* 572 F.2d at 725. As we stated in *United States v. Crummer,* 151 F.2d 958, 964 (10th Cir. 1945), *cert. denied,* 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012 (1946), a case involving a mail fraud scheme in which defendants unsuccessfully claimed the indictment was duplicitous:

> The scheme, as laid in the indictment, involved a multiplicity of ways and means of action and procedure, but it was a single scheme. And setting out the numerous ways and means of action and procedure included in the scheme for its accomplishment did not render the indictment duplicitous.

 Because of the complexity of the scheme and the concern over non-unanimous verdicts, the court nevertheless tendered a unanimity instruction to the respective juries as part of their instructions on count two. The court instructed each jury that although individual jurors need not agree on all the means or methods by which Defendants committed securities fraud, they must unanimously agree upon at least one such means or method to convict Defendants of securities fraud.[14] In this circuit, such an instruction " 'suffices to instruct the jury that they must be unanimous on whatever specifications they find to be the predicate of the guilty verdict.' " *Sasser,* 971 F.2d at 477 (quoting *United States v. Phillips,* 869 F.2d 1361, 1366 (10th Cir.1988), *cert denied,* 490 U.S. 1069, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989)).

 Wiles makes much ado over a question which the jury submitted to the court during deliberations. The question read: "Can you clarify the portion of your instruction to [the] jury regarding the requirement that we agree unanimously on one of many individual charges in each count of the indictment." Aplts. App. Vol I at 131. Wiles suggests that the jury's question illustrates that the jury did not understand the court's unanimity instruction and that the risk of a non-unanimous verdict against him was significant and prejudicial. Wiles' speculation is insufficient to cast doubt upon the jury's verdict.

 The court responded to the jury in detail, again stressing the requirement of unanimity for conviction.[15] We must pre-

---

**14.** The district court submitted the following unanimity instruction on count two to the jury at Wiles' trial:

> Count 2 of the indictment charges the Defendant Wiles with a violation of federal law concerning securities fraud. The indictment alleged a number of separate means or methods by which the defendant is accused of violating this law.
>
> The government is not required to prove all of the means or methods alleged in Count 2 of the indictment, but each juror must agree with each of the other jurors, however, that the same means or method alleged in Count 2 was, in fact, engaged in or employed by the defendant in committing the crime charged in Count 2 of the indictment. The jury need not unani-

mously agree on each means or method, but, in order to convict, must unanimously agree upon at least one such means or method as one engaged in by the defendant. Unless the government has proven the same means or method to each of you, beyond a reasonable doubt, you must acquit the defendant of the crime charged in count 2 of the indictment. Aplts.App. Vol. XII at 3354–56. The district court gave this same instruction to the jury at Schleibaum's trial. Aplts. App. at 333–35.

**15.** The court stated to the jury:

> In Count 2, the government alleged that in connection with the purchases and sales of Miniscribe stock, the defendant, Q.T. Wiles, with knowledge concerning Miniscribe's inflat-

sume that the jurors remained loyal to their oaths and conscientiously followed the district court's instructions. *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985). This assumption is fundamental to our system of justice. *United States v. Lonedog,* 929 F.2d 568, 576 (10th Cir.), *cert. denied,* 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991). A defendant who urges us "to find jurors unwilling, unable, or incapable of following a trial court's instructions bear a heavy burden of persuasion." *United States v. Carter,* 973 F.2d 1509, 1514 (10th Cir.1992), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1289, 122 L.Ed.2d 681 (1993). Wiles has not met this burden.

## C.

██ Wiles contends the government presented insufficient evidence of his knowledge of the fraudulent scheme to sustain the jury's verdicts against him. The district court summarily rejected this argument. While a challenge to the sufficiency of the evidence presents a question of law subject to de novo review, *United States v. Markum,* 4 F.3d 891, 893 (10th Cir.1993), well established principles govern that review.

██ In addressing a sufficiency of the evidence argument, we examine all the evidence in a light most favorable to the government and ask whether that evidence, together with all reasonable inferences to be drawn therefrom, can support a finding of guilt beyond a reasonable doubt. *United States v. Wacker,* 72 F.3d 1453, 1462 (10th Cir.1995), *cert. denied,* ── U.S. ──, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996). "While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not

negate all possibilities except guilt." *United States v. Johnson,* 42 F.3d 1312, 1319 (10th Cir.1994), *cert. denied,* ── U.S. ──, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995) (internal quotations omitted). We will overturn a guilty verdict only if *no* rational trier of fact could have found the contested elements of the crime beyond a reasonable doubt. *United States v. Owens,* 70 F.3d 1118, 1126 (10th Cir.1995).

██ Wiles' sufficiency argument need not detain us long. To be sure, Wiles denied any knowledge of any wrongdoing at Miniscribe during the course of the cover-up. And the jury could have believed him had it so chosen; but the jury chose not to believe him. Instead, the jury chose to believe the myriad of government witnesses who by their testimony, and the reasonable inferences to be drawn therefrom, implicated Wiles as a key player in the scheme.

██ We have carefully reviewed the voluminous trial record and have no quarrel with the jury's finding that Wiles knew quite well of the cover-up, and acted to further its illicit purposes and ultimate aims. The testimony of other key players in the scheme, namely Owen Taranta, Jesse Parker, Kenneth Huff, Warren Perry, Gerald Goodman, and William Lorea, as well as the testimony of Miniscribe employees Marta Van Der Schouw, Gene Dehner, Kelly Hicks, and Hannah Bolster–Valadez, is sufficient to sustain the jury's finding that Wiles knew of the fraudulent scheme. "'To the extent the evidence conflict[ed], we [are required to] accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses.'" *Owens,* 70 F.3d at 1126 (quoting *United States v. Sapp,* 53 F.3d 1100, 1103

---

ed inventory, income before taxes and net income, all resulting from illicit efforts to conceal an inventory shortfall, one, employed a device, scheme or artifice to defraud. This refers to the scheme to conceal an inventory shortage. Or, two, made untrue statements of material facts or made material omissions of fact causing statements made to be misleading. This refers to false statements in the annual reports. Or, three, engaged in a fraud and deceit upon Miniscribe shareholders and unwitting purchasers and sellers of stock. This

refers to insider trading, that is, using insider information on the sale of his stock.

The government need not prove all three of these means or methods of committing the crime of securities fraud. It is necessary, however, before there can be a conviction on this count, that the jury must unanimously agree that at least one of these means or methods has been proven beyond a reasonable doubt, and all jurors must agree on the same means or method.

Aplts.App. Vol. XII at 3398.

(10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996)).

### D..

Relying on *Travis v. United States,* 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), Wiles next asserts that venue on the false statements charge under 18 U.S.C. § 1001 was improper in the District of Colorado. Count one specifically charged Wiles with causing Miniscribe to make a false 1987 10–K report, which was filed with the SEC in Washington, D.C. Wiles argues that the District of Columbia was the only proper venue. The district court disagreed, concluding venue was proper in the District of Colorado.

■■■ Venue in federal criminal prosecutions is a question of fact which the government must prove. *Wilkett v. United States,* 655 F.2d 1007, 1011 (10th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). Unlike the elements of the substantive crime, however, the government must prove venue only by a preponderance of the evidence. *Id.*

■■■ In reviewing a challenge to venue, we view the evidence in a light most favorable to the government and ask whether the government proved by a preponderance of the evidence, direct or circumstantial, that the crime charged occurred within the district of prosecution. *United States v. Rinke,* 778 F.2d 581, 584 (10th Cir.1985). Applying this standard, we agree with the district court that venue on the § 1001 charge was proper in the District of Colorado.

We begin with U.S. Const. art. III, § 2, which provides that the "trial of all crimes ... shall be held in the state where the said crimes shall have been committed." This requirement is reiterated in the Sixth Amendment and codified in Fed.R.Crim.P. 18, which provides that criminal prosecutions "shall be had *in a district* in which the offense was committed." (emphasis added). Rule 18 recognizes that criminal acts may extend beyond the borders of a single district. Congress addressed the issue of venue in multidistrict crimes in 18 U.S.C. § 3237(a):

Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Because § 1001 does not contain an express venue provision, we rely on § 3237(a). *See United States v. Ryan,* 894 F.2d 355, 360 (1990).

In *Travis,* the government charged the defendant with violating 18 U.S.C. § 1001. The Supreme Court addressed the issue of venue under 18 U.S.C. § 3237(a). The defendant, a union officer, filed false non-Communist affidavits with the National Labor Relations Board (NLRB) in Washington, D.C. The defendant made and executed the affidavits in Colorado. The Court held that venue was improper in the District of Colorado. "Where Congress is not explicit, 'the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *Travis,* 364 U.S. at 635, 81 S.Ct. at 361 (quoting *United States v. Anderson,* 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946)).

Unlike the SEC rules and regulations which bound Wiles, however, the applicable law in *Travis* did *not* require the filing of any statement with the government. Rather, the filing of the non-Communist affidavits was voluntary, but a condition precedent to the union invoking the investigatory powers of the NLRB. The Court stated: "[T]he National Labor Relations Act, with which we are concerned, did not require union officers to file non-Communist affidavits. If it had, the whole process of filing ... might logically be construed to constitute the offense." *Travis,* 364 U.S. at 635, 81 S.Ct. at 361.

Section 1001 specifically proscribes the *making* of false statements to the government. In Wiles' case, the law required Miniscribe to make a 1987 10–K Report and file it with the SEC. 15 U.S.C. § 78m(a); 17 C.F.R. §§ 240.13a–1, 249.310. A knowing or willful failure to make and file the required 10–K Report is a crime. 15 U.S.C. § 78ff.

Thus, we conclude that "the whole process of filing ... constitute[s] the offense" in this instance. *Id.* This includes the District of Colorado where the false 10–K was made. *See United States v. Zwego,* 657 F.2d 248, 251 (10th Cir.1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1275, 71 L.Ed.2d 460 (1982) (in prosecution for making false statements to federally insured bank, venue is proper where statements were "prepared, executed, or made," or received by bank).

### E.

Wiles finally asserts that the district court improperly admitted hearsay testimony on count three's wire fraud charge under 18 U.S.C. § 1343. Count three alleged Wiles' participated in a scheme designed to defraud Standard Chartered Bank (SCB) into lending Miniscribe monies. Wiles does not challenge the admission of any particular statement by any particular witness on count three. Rather, Wiles claims that the government's evidence did not establish that his involvement with SCB on behalf of Miniscribe was part of any fraudulent scheme. Thus, according to Wiles, any hearsay testimony as to Wiles' negotiations with SCB and Miniscribe's resulting loan agreement with SCB was inadmissible. We disagree.

■ At the close of the government's case-in-chief, the court concluded that the government had established a common fraudulent scheme among Miniscribe's management, and that Wiles participated in that scheme from October 14, 1987 through February 1989. The court ruled that under Fed. R.Evid. 801(d)(2)(E), hearsay testimony of the scheme's participants was admissible on all counts of the indictment against Wiles.[16] We review the district court's decision to admit testimony under the hearsay exception of Rule 801(d)(2)(E) for an abuse of discretion. *United States v. Olivo,* 69 F.3d 1057,

1066 (10th Cir.1995), *on reh'g,* 80 F.3d 1466 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 265, 136 L.Ed.2d 189 (1996).

■ Rule 801(d)(2)(E) excepts from the definition of hearsay "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy," where the statement is offered against the party. Fed. R.Evid. 801(d)(2)(E). The party need not be charged with conspiracy. The rule applies where the evidence shows two or more individuals acting in concert despite the absence of a conspiracy charge. *United States v. Durland,* 575 F.2d 1306, 1308 (10th Cir.1978).

■ The evidence against Wiles plainly established that he acted in concert with other members of Miniscribe's management team in concealing the inventory hole beginning at management's quarterly meeting on October 14, 1987. The evidence further supports the district court's finding that Wiles' participation continued through February 1989 when he resigned. Wiles' argument that defrauding SCB was not a consideration in the decision to conceal the inventory hole is misplaced. We stated in *United States v. Russell,* 963 F.2d 1320, 1322 (10th Cir.), *cert. denied,* 506 U.S. 898, 113 S.Ct. 280, 121 L.Ed.2d 207 (1992):

> [C]onspirators are responsible for crimes committed "within the scope of the unlawful project" and thus "reasonably foreseen as a necessary or natural consequence of the unlawful agreement." ... [A] conspiracy, once instituted, continues to exist until it is abandoned, succeeds, or is otherwise terminated by some affirmative act, such as withdrawal by the defendant.

(quoting *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946)).

The fraud Wiles perpetrated on SCB was a foreseeable and natural consequence of the

---

**16.** The district court stated:
[W]ith respect to the admissibility ... under 801(d)(2)(E) of the statements by co-conspirators that are therefore not hearsay, I'm finding that by a preponderance of the evidence that ... the Government has proved the defendant began participation in the conspiracy ... at the October 14, 1987 meeting. And, that it continued ... through the dates of the charges in the indictment here which go to February of 1989. It's actually March of 1989 in the indictment ... but I find that it continued through February of 1989. And that among the participants were all those who were present at the October 14, 1987 meeting and, of course, a number of other persons.
Aplts.App. Vol. X at 2714.

scheme to conceal the inventory hole and falsify Miniscribe's financial statements. Large businesses naturally look to banks to supply working capital through lending agreements. Miniscribe was no different. Banks in turn naturally rely on the financial statements of the business and the representations of its management to determine the nature and extent of the loan. SCB was no different. At the time of SCB's loan agreement with Miniscribe, Wiles' participation in the fraudulent scheme was ongoing. The district court did not abuse its discretion in concluding that hearsay testimony offered against Wiles was admissible under Fed. R.Evid. 801(d)(2)(E) to prove the wire fraud charges against him.

### F.

■■■ Lastly, Schleibaum argues that making false statements to the SEC cannot serve as the basis for his conviction under 18 U.S.C. § 1001. Schleibaum asserts that Congress intended the government to prosecute the making of false statements to the SEC under 15 U.S.C. § 78ff alone. The district court rejected Schleibaum's argument. We review the district court's interpretation of a criminal statute do novo, *United States v. Rothhammer*, 64 F.3d 554, 557 (10th Cir.1995), and also reject Schleibaum's argument.

The general prohibition against making false statements to the government is contained in the United States Criminal Code at 18 U.S.C. § 1001. A specific prohibition against making false statements to the SEC is contained in the Securities Exchange Act of 1934 at 15 U.S.C. § 78ff. Section 78ff provides:

> [A]ny person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder ... which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $1,000,000, or imprisoned not more than 10 years, or both ....

15 U.S.C. § 78ff. Congress passed the Securities Exchange Act of 1934 shortly before passing the general prohibition against making false statements to the government. Unlike § 1001, materiality is an express element of making a false statement under § 78ff.

The only decision to address Schleibaum's argument is *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). Using general principles of statutory construction, a divided panel of the Second Circuit held that nothing in the legislative history of either § 78ff or § 1001 indicated that the latter could not be used to charge the making of false statements to the SEC. The court noted the general rule that criminal statutes may overlap: " '[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.' " *Id.* at 1300 (quoting *United States v. Batchelder*, 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979)). The legislative history did not indicate whether Congress sought to restrict prosecutions under § 1001 by enacting § 78ff, and the proximity of the laws' enactments did not persuade the court that Congress intended such a result.

The dissent, upon which Schleibaum relies, noted that in the Second Circuit materiality under the second and third clauses of § 1001 was not an element of the offense. *E.g.*, *United States v. Elkin*, 731 F.2d 1005, 1009 (2d Cir.), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984), *overruled by United States v. Ali*, 68 F.3d 1468, 1474–75 (2d Cir.1995) (materiality is an element of any § 1001 offense), *on reh'g*, 86 F.3d 275 (2d Cir.1996). The dissent reasoned that the court's holding made the materiality element of § 78ff superfluous. *Bilzerian*, 926 F.2d at 1305 (Winter, J., dissenting). The dissent concluded that the government should not be permitted to charge a defendant under § 1001 and obtain a conviction for conduct proscribed by § 78ff without having to prove materiality because Congress could not have intended such a result. *Id.*

We do not share the dissent's concern. As we previously noted, in the Tenth Circuit materiality has long been an element of any

false statements offense under § 1001. *Gonzales*, 286 F.2d at 120. The government must prove a false statement's materiality under both § 78ff and § 1001. Thus, permitting the government to charge the making of false statements to the SEC under § 1001 does not render the materiality element of § 78ff superfluous in the Tenth Circuit. Without any express indication that Congress intended otherwise, we join the Second Circuit and conclude that both § 78ff and § 1001 proscribe the making of false statements to the SEC, and the government may prosecute such conduct under either statute.

For the reasons contained in Part II.A. of the opinion, Wiles' and Schleibaum's convictions on Count I of the respective indictments charging them with a violation of 18 U.S.C. § 1001 are vacated. For the reasons contained in Parts II.B–F. of the opinion, the district court's judgments are affirmed in all other respects.

AFFIRMED IN PART, VACATED IN PART, and REMANDED for further proceedings consistent with this opinion.

LUCERO, Circuit Judge, with whom EBEL, Circuit Judge, joins, concurring in part, dissenting in part.

Recognizing that the *Wiles, Schleibaum* and *Pappert* cases present a common issue, one created by the Supreme Court decision in *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), this court agreed to consider two related questions en banc: (1) "whether the failure to instruct the jury on the issue of materiality ... constitutes a structural error"; and if so, (2) "whether the error is reversible per se or reviewable under the plain-error analysis set out in *United States v. Olano,* [507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508] (1993)." En Banc Order (June 3, 1996). I concur in the majority's conclusion as to the first question. But I dissent from its *"per se"* resolution of

the second. The mere classification of an error as "structural" does not automatically dictate reversal under Fed.R.Crim.P. 52(b) plain-error review.[1]

From its earliest roots, plain-error review has been discretionary. *Wiborg v. United States,* one of the first statements of the common law rule, holds that "if a plain error was committed in a matter so absolutely vital to defendants, *we feel ourselves at liberty to correct it,"* even if the defendant has "not duly excepted" the error. 163 U.S. 632, 658, 659, 16 S.Ct. 1127, 1137, 1138, 41 L.Ed. 289 (1896) (emphasis added).[2] Over time, appellate discretion to correct for plain error came to be exercised solely for the limited purpose of avoiding miscarriages of justice. *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). In *United States v. Atkinson,* the Court established a different approach to plain error while maintaining the discretion of earlier cases. In what has come to be known as the *Atkinson* standard, the Supreme Court held that "[i]n exceptional circumstances, especially in criminal cases, appellate courts ... may, of their own motion, notice errors to which no exception has been taken ... [if they] seriously affect the fairness, integrity or public reputation of judicial proceedings." 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936) (emphasis added).

Referring to unnoticed structural errors, the Court in *Olano* subsequently noted that "[t]here may be a special category of forfeited errors that *can be corrected regardless of their effect on the outcome.*" 507 U.S. at 735, 113 S.Ct. at 1778 (emphasis added). Finally, Rule 52(b) is couched in discretionary terms: "Plain errors or defects affecting substantial rights *may be noticed* although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b) (emphasis added); *compare* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which

---

1. Because we decide only the common legal issues of the three cases en banc, we should not purport to apply the common legal rule to the disparate facts of each case. Rather, all three cases should be resubmitted to the panels to decide the outcome under the rule we enunciate today. *See Turner v. Small Business Admin. (In re Turner),* 84 F.3d 1294, 1299 (10th Cir.1996)

(en banc) (deciding en banc issue as a matter of law and remanding to panel for further consideration in light of new rule).

2. The drafters of the federal rules cite *Wiborg* for the common law rule. Fed.R.Crim.P. 52(b) (advisory committee note).

does not affect substantial rights *shall* be disregarded." (Emphasis added)). The Supreme Court has carefully avoided mandating automatic reversal for plain errors. In a case arising from our circuit, the Court unambiguously states that "a *per se* approach to plain-error review is flawed." *Young,* 470 U.S. at 16 n. 14, 105 S.Ct. at 1047 n. 14.

The court today ignores this long line of authority. Although the majority claims the mantle of Supreme Court precedent, I do not believe any case supports a rule that strips appellate courts of discretion to review cases for plain errors merely because they are labeled "structural."[3] The majority cites *Olano* for the proposition that "structural" error falls within that "'special category of forfeited errors' that does not require a showing of prejudice, but rather, *must be corrected.*" Maj. Op. at 1061–62 (emphasis in original). *Olano* states no such principle. It holds that "this issue need not be addressed." *Olano,* 507 U.S. at 735, 113 S.Ct. at 1778. It does no more than suggest that under the third prong of plain-error analysis there are some errors that may automatically affect substantial rights without a showing of prejudice, and that "can" be corrected. *Id.*

The inescapable import of the majority's opinion is that the error asserted here escapes review under plain-error's fourth prong, the *Atkinson* standard. *See* Maj. Op. at 1062 n.13. To the extent the majority relies on *Olano,* it is mistaken. The Supreme Court majority in *Olano* never considers whether the error before it "would have warranted" correction under the fourth prong of the plain-error test, because it concludes that the error (allowing alternate jurors to participate in the jury deliberations) was not prejudicial and therefore did not "affect substantial rights." *See Olano,* 507 U.S. at 741, 113 S.Ct. at 1781. It thus never reaches the issue before us. Justice Stevens, however, speaking for three members of the Court, views the error in *Olano* as structural and necessarily affecting the defendant's substantial rights, thus satisfying the third prong of plain-error review. *Id.* at 743–44, 113 S.Ct. at 1782–83 (Stevens, J., dissenting). While Justice Stevens concludes that under harmless-error review the error is automatically reversible, *id.* at 744, 113 S.Ct. at 1783, he continues:

> Reading "substantial rights" the same way in Rule 52(b) as in Rule 52(a) does not, of course, eliminate the difference between cases in which no objection is made and those in which one is. A nonforfeited error affecting substantial rights must be corrected under Rule 52(a). A forfeited error, however, even if it is plain and affects substantial rights, "may" be corrected at the discretion of the reviewing court under Rule 52(b). It is this distinction between automatic and discretionary reversal that gives practical effect to the difference between harmless-error and plain-error review, and also every incentive to the defendant to raise objections at the trial level.

*Id.* (citation omitted). Hence, the only three members of the Supreme Court to have addressed the precise issue before us would find fault with the result we reach today.[4]

The Supreme Court's rejection of an automatic rule of reversal makes good sense. Such a rule could free a defendant even though the structural error did not seriously

---

**3.** The majority cites *Rose v. Clark,* 478 U.S. 570, 577, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986), and *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993), for the proposition that structural errors mandate reversal. These cases, like all the others cited by the majority on the question of structural error, address harmless, not plain errors. The language in *Rose* and *Sullivan,* although broad, cannot be read outside of the harmless-error context. *See infra* at p. 1070.

**4.** On this point, the Supreme Court has recently granted review of an unpublished Eleventh Cir-

cuit decision, *United States v. Johnson,* No. 95–2417, 82 F.3d 429 (11th Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 451, 136 L.Ed.2d 346 (1996), that may resolve the issues before the en banc court. Moreover, our inquiry in the *Pappert* case is complicated by the fact that the Supreme Court has yet to decide whether materiality is an element of the § 1014 offense, let alone whether the error falls within a special category of cases that would mandate reversal under harmless-error analysis. *See United States v. Wells,* 63 F.3d 745 (8th Cir.1995), *cert. granted,* —— U.S. ——, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996).

affect the "fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 732, 113 S.Ct. at 1776 (quotation omitted). Moreover, automatic reversal omits appellate analysis of the entire record under the *Atkinson* standard, thus preventing the Supreme Court from reviewing our decision to correct the error for an abuse of discretion. *See Young,* 470 U.S. at 15–16, 105 S.Ct. at 1046 (majority opinion), at 22 n.1, 105 S.Ct. at 1049 n. 1 (Brennan, J. concurring in part and dissenting in part). Notwithstanding the uninterrupted line of cases giving appellate courts discretion to correct plain error, the majority is enamored of its *per se* rule and claims that the Supreme Court requires it. I disagree.

The majority's preoccupation with the *per se* rule stems from its focus on the interrelationship between harmless-error review and structural errors. Harmless-error analysis, under which all of the structural error cases cited by the majority were decided, serves a different function from plain-error review. Harmless-error rules were adopted to avoid automatic reversal for trivial errors that have no effect on the outcome of a trial. *See* Roger J. Traynor, *The Riddle of Harmless Error* 13–14 (1970). Such rules "serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). In the same vein, the Court notes "that the harmless error doctrine is essential to preserve the 'principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence.'" *Arizona v. Fulminante,* 499 U.S. 279, 308, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)).

Errors involving the presentation of the case to the jury, labeled "trial errors," may be "quantitatively assessed in the context of other evidence presented in order to determine whether their admission was harmless beyond a reasonable doubt." *Id.* at 307–08, 111 S.Ct. at 1264. Other errors, labeled structural, are regarded as "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309, 111 S.Ct. at 1265. These latter errors share "a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. at 1265. Such errors create "consequences that are necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana,* 508 U.S. 275, 282, 113 S.Ct. 2078, 2083, 124 L.Ed.2d 182 (1993). In cases marred by structural error it is impossible to review for harmless error and "quantitatively assess[ ] [the effect of the error] in the context of other evidence presented." *Fulminante,* 499 U.S. at 308, 111 S.Ct. at 1264. For this reason, the "affecting substantial rights" third prong of *Olano* is assumed satisfied even without proof of prejudice.[5]

**5.** The distinction between trial and structural error was born in controversy in the 1991 *Fulminante* decision. Justice White, speaking for four dissenters, called the distinction a "meaningless dichotomy," noting "our jurisprudence on harmless error has not classified so neatly the errors at issue." 499 U.S. at 290–91, 111 S.Ct. at 1254–55. Chief Judge Harry T. Edwards refers to it as a "distinction that I find baffling and mostly unhelpful." Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?,* 70 N.Y.U. L.Rev. 1167, 1207 (1995). If the essential distinction between trial and structural errors lies in their susceptibility to being quantitatively assessed in the context of other evidence presented the jury, *see Fulminante,* 499 U.S. at 307–08, 111 S.Ct. at 1263–64, the framework is flawed because the cases labeled as structural and trial errors do not accurately divide on the basis of the feasibility of appellate review. *See* Charles J. Ogletree, Jr., *Arizona v. Fulminante: The Harm of Applying Harmless Error to Coerced Confessions,* 105 Harv. L.Rev. 152, 164–66 (1991). In essence, the Court has not yet "clearly articulate[d] the structure that structural errors undermine." *Id.* at 164.

At the margin, there is much disagreement about which label to affix to a given error. This point is well demonstrated by the views of my separately dissenting colleague, Judge Briscoe, who would pigeonhole *Gaudin* error in the "trial-error" box, as well as by the wide range of views noted at footnotes 12 and 13 of the majority opinion. The problem with affixing the "structural" label is that it denotes harmless-error consequence, while merely connoting the level of egregiousness of the error; to the extent that it requires correcting error that does not affect the fundamental fairness of the trial's re-

I part with the majority to the extent that it regards structural error as automatically deeming judicial proceedings fundamentally unfair, thereby escaping fourth-prong *Atkinson* review. Maj. Op. at 1062 n.13. Such an approach is both over-inclusive and under-inclusive. Some errors, the admission of a coerced confession, for example, might seem of a sufficiently grave magnitude that "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Coercing a confession by physical force or psychological torture—the Court draws no distinction between the two, *see, e.g., Rogers v. Richmond*, 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961)—so deeply offends the sense of justice of a civilized society, *see Fulminante*, 499 U.S. at 293, 111 S.Ct. at 1256 (White, J., dissenting), that every practicable step should be taken to eradicate the practice. Yet *Fulminante* specifically holds that admission of a coerced confession into evidence is not structural error. Rather, such admission is subject to harmless-error review precisely because it does not affect the structure within which the trial proceeds. *Id.* at 309–11, 111 S.Ct. at 1264–66. As wrong as it is to allow the jury to consider a coerced confession, that flaw is not structural, and it does not escape harmless-error review.

By contrast, the claimed error in these cases, that of taking an element of the offense away from the jury, is structural in the sense defined by *Fulminante* and applied in *Sullivan*. Yet I cannot conclude that this error requires reversal in every case, regardless of the posture in which it was raised. True, this error defies harmless-error review. This is because we cannot meaningfully contemplate its effect on the jury's deliberation—the nature of the error was to remove an issue from the jury. Plain-error review, as noted above, has a different focus than harmless-error review; it concerns the error's effect on the fairness of the proceedings. Given that different focus, an error in the structure of the proceedings that defies harmless-error review remains subject to plain-error analysis. In some cases, such as where there is overwhelming evidence on an element and the defendant never even contested its factual predicate, the judicial proceedings, taken as a whole, might be considered eminently fair despite the structural error.

Because a defendant may either waive or forfeit almost any constitutional right, *see Olano*, 507 U.S. at 731, 113 S.Ct. at 1776, plain-error review[6] acts to safeguard the fundamental justice and fairness embodied in the judicial process. Contrary to the majority's assumption, plain-error review does not look merely at what the jury might have done had the defendant not forfeited his right. *See Young*, 470 U.S. at 15–16, 105 S.Ct. at 1046–47. While "[a] defendant may

---

sult, it fuels the criticism of the criminal process that a "guilty defendant is let free on a mere technicality." If the distinction between trial and structural error is to be imported into plain-error analysis, in order to exercise appellate discretion the temptation would be to divine different levels of structural error, some warranting reversal, others not. The majority avoids this Dantean spectacle by ignoring its discretion under plain-error review altogether. Judge Briscoe does so by calling the error under review "trial error."

6. In their briefing en banc, appellants argue that harmless-error, rather than plain-error review is applicable to cases such as this, where the opportunity to object was foreclosed by the then-current state of the law. Because the constitutional right only arose after trial, appellants contend that they did not "forfeit" any right. Strictly

speaking, appellants are correct. Cases such as this do not involve the forfeiture of existing rights. Nevertheless, courts generally apply plain-error, not harmless-error review in such situations. *See, e.g., United States v. Randazzo*, 80 F.3d 623, 631 (1st Cir.1996) (applying plain-error review); *United States v. Washington*, 12 F.3d 1128, 1138–39 (D.C.Cir.) (same), *cert. denied*, —— U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994); *but see United States v. Keys*, 95 F.3d 874, 878 (9th Cir.1996) (en banc) (applying harmless-error review). I believe that application of plain-error review in this case strikes the proper balance between the defendants' interest in having a new right considered on direct review, and the judicial system's interest in orderly administration of cases and finality of proceedings in which the trial court acted properly under the then-existing law. *See Randazzo*, 80 F.3d at 631–32.

assuredly insist upon observance of [the jury trial] guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt," *Carella v. California*, 491. U.S. 263, 268, 109 S.Ct. 2419, 2422, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring), where the defendant fails to insist on observance of this guarantee at trial we are under no obligation to restore it for him on appeal.[7]

The majority's conclusion misreads plain-error law. It gives shrewd attorneys the opportunity to engage in improper gamesmanship at no risk to their clients, and is inappropriate as a matter of policy. One need not exercise asymptotic levels of imagination to conceive that under the rule announced today, counsel may deliberately overlook a structural error in the trial proceeding, such as a faulty reasonable doubt instruction to the jury, *see Sullivan*, 508 U.S. 275, 113 S.Ct. 2078, knowing that if the jury convicts, her client will nonetheless be guaranteed a new trial. The whole purpose of distinguishing between harmless-error and plain-error review is to eliminate these tactics. We should leave plain-error review for its intended purpose: correcting those errors under Rule 52(b) which "seriously affect the fairness, integrity or public reputation of judicial proceedings."

For the foregoing reasons, while I join in the court's conclusion as to Part II.A.2.c., I respectfully dissent from the court's resolution of the second question before us, Part II.A.2.b. I would hold that failure to instruct under *Gaudin* is not error that automatically mandates reversal. I would analyze the facts of each case under the fourth prong, the *Atkinson* standard of plain-error review, as required by *Olano*. I would resubmit the individual cases back to the original panels for decisions pursuant to this standard.

BRISCOE, Circuit Judge, dissenting:

Two issues are presently before this court for en banc consideration: (1) "whether the failure to instruct the jury on the issue of materiality ... constitutes a structural error"; and, if so, (2) "whether the error is reversible per se or reviewable under the plain error analysis set out in *United States v. Olano*, [507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508] (1993)." In answering these questions, I conclude failure to instruct the jury on the issue of materiality is not structural error. Therefore, I dissent from the majority's conclusion as to the first question. I agree that failure to instruct on the element of materiality is error, but whether it is reversible error presents a question beyond those designated by this court for en banc review. Answering the first question in the negative, I need not reach the second question. Because I conclude the error is not structural, I would apply the plain error analysis of Rule 52(b) in the absence of a timely objection at trial. However, given the

---

7. In footnote 10, the majority announces an exception to the rule that *Gaudin* errors are structural and must be reversed in all circumstances. This exception, for cases in which the defendant stipulates to removal of an element, is of limited utility and should have no bearing on our ability to review for plain error. I agree that if a defendant *stipulates* to an element of the offense, it is not error to remove it from the jury's consideration. *See United States v. Mason*, 85 F.3d 471, 472 (10th Cir.1996). But because the "structuralness" of *Gaudin*-type error arises from the denial of the defendant's right to have the jury decide each element of the offense beyond a reasonable doubt, an informal concession of an element by the defendant or his attorney would not remove his right to a jury determination of that element. *See* 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 21.1(h) (1984) (jury trial may only be waived by "express and intelligent consent of the defendant," and should be made personally by defendant, either

in writing or in open court); *see also* Fed. R.Crim.P. 23(a) (waiver of jury trial must be in writing).

While the majority suggests that "[a] situation may arise when a reviewing court may conclude with complete confidence that a failure to instruct on an element of an offense did not play a role in the jury's verdict on that offense," applying footnote 10 to anything short of a stipulation would engage us in determinations of "harmless structural error." *See California v. Roy*, — U.S. —, — — —, 117 S.Ct. 337, 339–40, 136 L.Ed.2d 266 (1996) (Scalia, J., concurring) (where an element of the offense was not presented to the jury, the error can be harmless "only if the jury verdict on other points effectively embraces this one or if it is impossible, upon the evidence, to have found what the verdict did find without finding this point as well."). In any event, whether or not the error is deemed structural, it should not limit our review for plain error.

unique circumstance created in these cases as a result of an intervening change in the settled law of this circuit, I would require the government to bear the burden of proving the absence of prejudice because defendants' failure to object was the result of their reliance upon settled law. *See United States v. Viola,* 35 F.3d 37, 42 (2d Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1270, 131 L.Ed.2d 148 (1995). I would resubmit the individual cases to the original panels for decision pursuant to these standards. I express no opinion regarding whether the convictions of the defendants should be vacated, as those questions are more appropriate for the panel in each case to decide.

In a recent decision by the Supreme Court in a habeas case, *California v. Roy,* —— U.S. ——, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996), the Court addressed the principal question before this court—whether failure to include an instruction on an element of a charged offense is structural error. The Court determined whether a *Chapman*[1] or a *Kotteakos*[2] standard for harmless error should be applied in a habeas case where the petitioner alleged the jury instructions underlying his conviction omitted an element of the charged offense. The majority opinion noted that if the omission had been a "structural defect," no form of harmless error analysis could be applied. The majority held that a *Kotteakos* harmless error standard inquiring as to whether there is a " 'grave doubt as to the harmlessness of an error' " would apply to the habeas review of Roy's conviction. The Court did not conclude that omission of an instruction on an element of an offense was structural error requiring automatic reversal, but rather referred to the error throughout its opinion as "trial error"[3] and ultimately remanded the case for further review under the harmless error standard it delineated.

Justice Scalia, concurring in *Roy,* agreed that omission of an instruction on an element of the crime is not itself structural error, but clarified that the error could be harmless only if the reviewing court on remand had the requisite degree of confidence that the jury necessarily found the existence of the omitted element. Without such a finding by the jury, reversal would be required under the principles of *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Interestingly, Justice Scalia cited *United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), in reaching the conclusion that absence of a formal verdict on a single element of an offense would not require automatic reversal.

The fact that *Roy* arises in the context of habeas review rather than in the context of a direct appeal is irrelevant. Although this distinction affects which harmless error standard applies, it does not alter the Court's conclusion that the omission of an instruction on an element of a crime is a "trial error."

The majority has compiled a list of cases where the error established by appellant required automatic reversal. Errors which require automatic reversal are structural errors. *See, e.g., Sullivan,* 508 U.S. at 282, 113 S.Ct. at 2083 (there are two classes of constitutional error—"trial error" subject to harmless error analysis, and "structural error" requiring automatic reversal) (Rehnquist, C.J., concurring). Not all constitutional violations require automatic reversal. *Chapman,* 386 U.S. 18, 87 S.Ct. 824. Only the most exceptional do. *See, e.g., Rose v. Clark,* 478 U.S. 570, 578, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). As I read the majority opinion, it does not add another constitutional right to the list of rights which will require automatic reversal if violated. Instead, the majority opinion holds that failure to instruct the jury on the element of materiality is an example of an error identified as "structural error" in *Sullivan*—the right to a jury determination of guilt on each element of the charged offense beyond a reasonable doubt. I disagree that absence of an instruction on materiality conclusively establishes a violation of this basic Sixth Amendment right and is thus, by itself, structural error.

---

1. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

2. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

3. The Court explicitly noted that the *Kotteakos* standard does not apply to structural errors.

Appellate courts should uphold the verdict reached in the district court unless, after inquiry, it is clear that reversal is unavoidable to protect the defendant's right to a fair trial.

> [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that might have occurred are subject to harmless-error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

*Rose*, 478 U.S. at 579, 106 S.Ct. at 3106 (citations omitted).

Even if *Roy* were completely distinguishable from the question we face, the cases decided by the Supreme Court which have identified the type of Sixth Amendment violation requiring automatic reversal do not support a conclusion that the error here requires automatic reversal and is therefore structural. The error of omitting an instruction on materiality does not preclude us from evaluating whether the evidence established guilt beyond a reasonable doubt or whether the jury rendered a verdict satisfying the interest of fairness.

In *Sandstrom v. Montana*, 442 U.S. 510, 523–24, 99 S.Ct. 2450, 2458–59, 61 L.Ed.2d 39 (1979), the Court held that an instruction creating a presumption of malice violated due process by shifting the burden of proof on intent to the defendant, contrary to *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (holding due process of law required conviction by proof beyond a reasonable doubt). In *Rose*, the Court addressed a question that *Sandstrom* left unanswered—whether a *Sandstrom* error required automatic reversal or, instead, was subject to a harmless error analysis. The Court in *Rose* noted that a directed verdict for the prosecution would violate the Sixth Amendment right to a jury trial in serious criminal cases and would require automatic reversal. "Where that right [to a jury verdict] is altogether denied, the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty." 478 U.S. at 578, 106 S.Ct. at 3106. However, the Court noted that a *Sandstrom* error was distinguishable from a directed verdict in that the jury still considered the disputed element. The Court reasoned it was possible that no jury could have found defendant committed the criminal act without also implicitly finding malice was established beyond a reasonable doubt. In such a case, the erroneous instruction on malice "is simply superfluous." *Rose*, 478 U.S. at 581, 106 S.Ct. at 3107. Despite the erroneous instruction, there would be no constitutional violation because the jury would have found " 'every fact necessary' to establish every element of the offense beyond a reasonable doubt." *Id.*

Thus, in *Sandstrom*, the Court held an erroneous instruction regarding the presumption of an element could produce a constitutionally deficient verdict. In *Rose*, the Court held that where an erroneous set of instructions to the jury does not "altogether den[y]" the possibility that the jury found " 'every fact necessary' to establish every element of the offense beyond a reasonable doubt," it is proper to inquire whether there has in fact been a violation of this constitutional right before requiring that the verdict be reversed. 478 U.S. at 578, 581, 106 S.Ct. at 3106, 3107. Hence, while an erroneous instruction alone is not structural error requiring automatic reversal, it may, in a given case, prejudice the defendant's substantial right to a jury verdict on each element of a charge. Whether an erroneous instruction violated the defendant's substantial rights in a given case is exactly the type of inquiry a Rule 52 analysis serves to answer.

The implications of *Sandstrom* and *Rose* to the present case are clear. As in *Sandstrom*, the Court in *Gaudin* identified an error capable of resulting in a constitutionally deficient verdict. As in *Sandstrom*, the

constitutional right at risk is the right to a determination by a jury on each element of the offense beyond a reasonable doubt. As in *Rose*, we now face the question of whether a particular error in instructing a jury will always deny the Sixth Amendment right to a jury finding of guilty on each element and therefore automatically require reversal, or whether in some cases the instructional error will not violate this Sixth Amendment right, providing defendant with an imperfect but fair trial.

The question before us assumes the jury was instructed on all but one element of the subject offense. Unlike the case where there is a directed verdict for the prosecution, in a case where an instruction on a single element is omitted, the right to a jury trial is not "altogether denied." Had the predicate facts so conclusively established materiality that no rational jury could reach the verdicts rendered without also finding the materiality element to be satisfied, failure to instruct on the element of materiality would be superfluous. If the jury implicitly found the materiality element was satisfied, it is of no constitutional moment that the district court, acting outside its authority, found the element to be satisfied as well.[4] As in *Rose*, it is conceivable both that the error could occur and that the constitutional right at issue could be preserved intact.[5] Thus, absence of an instruction on materiality is distinguishable from the absence of a

reasonable doubt instruction in *Sullivan*, where a harmless error analysis was simply impossible as there could be no basis in the record to conclude the jury implicitly applied a reasonable doubt standard because lack of such an instruction "vitiates all the jury's findings." 508 U.S. at 281, 113 S.Ct. at 2082. It is precisely the ability to review the record and render a meaningful determination as to whether an error affected a defendant's substantial rights that distinguishes a trial error from a structural error. *Fulminante*, 499 U.S. at 307–08, 111 S.Ct. at 1264. Where the jury has not received an instruction on reasonable doubt, a reviewing court will *always* remain in serious doubt that the defendant's basic Sixth Amendment rights have been adequately safeguarded. In contrast, where the jury has not received an instruction on materiality, a reviewing court *will not always* harbor such uncertainty.

The majority contends reversal is required because Rule 52 review would require a "wrong entity"—the appellate court—to make the determination on materiality. A Rule 52 standard that looks at the question of whether the jury found the missing element to be satisfied, rather than what a reasonable jury would have found, places the determination of materiality in the "right entity"—the jury. Applying such a Rule 52 standard does not offend the Sixth Amendment by placing the determination of guilt outside of the jury. *See Roy*, —— U.S. at

---

4. In such a case, the jury would have fulfilled its constitutional function to "stand between the accused and a potentially arbitrary or abusive Government that is in command of the criminal sanction." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977).

5. The majority opinion is largely consistent with the view I have set out. In footnote 10, the opinion states: "A situation may arise when a reviewing court may conclude with complete confidence that a failure to instruct on an element of the offense did not play a role in the jury's verdict on that offense.... Because both Wiles and Schleibaum contested the element of materiality at their respective trials, we are not confronted with that situation."

Similarly, in applying *Roy*, the majority notes its finding of structural error is based in part on the fact discerned from the *Wiles* and *Schleibaum* case records that the juries "did not render a verdict, formal or otherwise, ... on the ele-

ment of materiality." I disagree with the majority's view that the broad and far-reaching generic questions we have instructed the parties to brief can be answered by reference to the facts of two of the three cases we have consolidated herein. We have agreed to address whether failure to instruct on the element of materiality is structural error. We have not limited our questions to the particular facts developed in *Wiles* and *Schleibaum*. To the extent the majority reasons that Wiles' and Schleibaum's convictions should be vacated because after looking at the appellate records the majority is convinced the jury did not render "a verdict, formal or otherwise," it has engaged in a form of the Rule 52 analysis which I advocate. The majority apparently does not vacate the convictions simply because of a missing instruction. The majority finds the missing instruction merits reversal because it cannot find that the jury "otherwise" satisfied defendants' Sixth Amendment rights.

————————, 117 S.Ct. at 339–40; *Sullivan*, 508 U.S. at 280, 113 S.Ct. at 2082; *Carella v. California*, 491 U.S. 263, 268–70, 109 S.Ct. 2419, 2422–23, 105 L.Ed.2d 218 (1989); *Rose*, 478 U.S. at 580–81, 106 S.Ct. at 3107; *cf. United Brotherhood of Carpenters & Joiners of America v. United States*, 330 U.S. 395, 408, 67 S.Ct. 775, 782, 91 L.Ed. 973 (1947), *Bollenbach v. United States*, 326 U.S. 607, 614–15, 66 S.Ct. 402, 406, 90 L.Ed. 350 (1946) (strength of evidence no substitute for actual jury finding). Here, it is not conclusively established that the constitutional rights identified in *Sullivan* as the basis for an automatic reversal have been violated by the absence of a materiality instruction alone. By labeling the absence of a materiality instruction as structural error, the majority opinion requires a new trial without regard to whether the constitutional guarantee to a fair trial before an impartial jury has been satisfied.

I conclude failure to instruct the jury on the element of materiality, by itself, is trial error. As trial error, it is subject to analysis for plain error under Rule 52(b) in the absence of a timely objection at trial. However, as the failure to object was the result of defendants' reliance upon the settled law of this circuit, the government should bear the burden of proving the absence of prejudice. *See Viola*, 35 F.3d at 42.

KELLY and HENRY, Circuit Judges, join in the foregoing dissent.

